# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>Defendants. | Civil No. 1:15-cv-01385-TWP-TAB |
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>Defendants. | Civil No. 1:15-cv-01343-TWP-TAB |

ADDITIONAL CAPTION TO FOLLOW

| | |
|---|---|
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>                    Defendants. | Civil No. 1:15-cv-01361-TWP-TAB |

**OBJECTION OF SEAN J. GRIFFITH TO
PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT, CLASS CERTIFICATION, AND APPLICATION FOR
AWARD OF ATTORNEYS' FEE AND EXPENSES, AND
<u>NOTICE OF INTENTION TO APPEAR AT SETTLEMENT HEARING</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     DISCLOSURE SETTLEMENTS HAVE FALLEN INTO DISFAVOR ...........................2

III.    BACKGROUND TO THE LITIGATION ......................................................................6

        A.      Plaintiffs File Suit and Quickly Offer to Settle...........................................6

        B.      The Parties Settle Quickly for Supplemental Disclosures, and
               Remy Stockholders Overwhelmingly Approve a Premium Transaction................7

        C.      Plaintiffs' Investigation..................................................................................8

        D.      The Plaintiffs and the Objector ......................................................................9

IV.     THE COURT SHOULD REJECT THE PROPOSED SETTLEMENT...........................11

        A.      The Supplemental Disclosures are Not Plainly Material .......................................11

               1.      The Supplemental Disclosures Relating to Remy's
                      Financial Projections are Not Plainly Material ...........................................12

               2.      The Supplemental Disclosures Relating to UBS' Financial
                      Analyses are Not Plainly Material ...............................................................15

               3.      The Supplemental Disclosures Concerning the Background
                      of the Merger are Not Plainly Material........................................................16

        B.      The Release is Overbroad ..............................................................................18

        C.      The Released Claims Have Not Been Adequately Investigated ...........................21

        D.      The Other Factors Cited by Plaintiff Do Not Support Approval ..........................21

               1.      Plaintiffs Offered a Broad Release in Exchange for Weak Disclosures....22

               2.      The Court Should Take No Comfort From the Silence of the Class .........22

               3.      The Parties' Negotiation and the Endorsement of Class
                      Counsel Deserve Little Weight ...................................................................23

V.      THE PROPOSED SETTLEMENT CLASS SHOULD NOT BE CERTIFIED ...............23

VI.     THE COURT SHOULD REJECT THE FEE REQUEST................................................24

        A.      Plaintiffs' Lodestar is Artificially Inflated..............................................................25

      B.      Plaintiffs' Fee Request is Greater Than Justified by Other Actions ..................... 26

VII.    THE COURT SHOULD ALLOW OBJECTOR'S COUNSEL TO SUBMIT A FEE REQUEST ........................................................................................... 26

VIII.   CONCLUSION ............................................................................................................ 27

## TABLE OF AUTHORITIES

### FEDERAL CASES

*GE Capital Corp. v. Lease Resolution Corp.*,
    128 F.3d 1074 (7th Cir. 1997) .......................................................................21

*In re Aqua Dots Product Liability Litig.*,
    654 F.3d 748 (7th Cir. 2011) ................................................................. 23-24

*In re Walgreen Co. Stockholder Litigation*,
    ___ F.3d. ___, 2016 WL 4207962 (7th Cir. Aug. 10, 2016) .................................... *passim*

### STATE CASES

*David P. Simonetti Rollover IRA v. Margolis*,
    2008 WL 5048692 (Del. Ch. June 28, 2008) ...................................................18

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015).......................................................................1

*In re CheckFree Corp. S'holders Litig.*,
    2007 WL 3262188 (Del. Ch. Nov. 1, 2007) ...................................................13

*In re Gen. Motors (Hughes) S'holder Litig.*,
    2005 WL 1089021 (Del.Ch. May 4, 2005),
    *aff'd*, 897 A.2d 162 (Del.2006) ...................................................................13

*In re John Q. Hammons Hotel*,
    2009 WL 3165613 (Del. Ch. Oct. 2, 2008) ...................................................18

*In re Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*,
    11 A.3d 1175 (Del. Ch. 2010)........................................................................14

*In re Micromet, Inc. S'holders Litig.*,
    2012 WL 681785 (Del. Ch. Feb. 29, 2012) ...................................................12

*In re Pure Res., Inc. S'holder Litig.*,
    808 A.2d 421 (Del. Ch. 2002).........................................................................12

*In re Riverbed Tech., Inc. S'holders Litig.*,
    2015 WL 5458041 (Del. Ch. Sept. 17, 2015) ...............................................10

*In re Riverbed, Inc. S'holders Litig.*,
    2015 WL 7769861 (Del. Ch. Dec. 2, 2015)..............................................10,27

*In re Sauer-Danfoss Inc. S'holders Litig.*,
   65 A.3d 1116 (Del. Ch. 2011)....................................................................8, 17, 18, 21, 26

*In re Trulia, Inc. S'holder Litig.*,
   129 A.3d 884 (Del. Ch. 2016)................................................................. *passim*

*Nguyen v. Barrett*,
   2015 WL 5882709 (Del. Ch. Oct. 8, 2015),
   *aff'd* 2015 WL 5924668 (Del. Oct. 9, 2015).....................................................14

*Nguyen v. Barrett*,
   2016 WL 5404095 (Del. Ch. Sept. 28, 2016) ...................................................14

*Skeen v. Jo-Ann Stores, Inc.*,
   750 A.2d 1170 (Del. Ch. 2000)........................................................................12

## DOCKETED CASES

*In re Art Tech. Grp., Inc. S'holders Litig.*,
   C.A. No. 5955-VCL (Del. Ch. Dec. 21, 2010)....................................................... 18

*Turberg v. ArcSight*,
   C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011)...................................................14

*Vergiev v. Aguero*, Order and Judgment, and Statement of Reasons,
   Docket No. L-2276-15 (N.J. Sup. Ct.—Union Cty. June 5, 2016)...............................9, 10

Order, *Vergiev v. Aguero*,
   Docket No. L-2276-15 (N.J. Sup. Ct.—Union Cty. Sept. 26, 2016) .......................... 26-27

## OTHER AUTHORITIES

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*,
   2003 U. Chi. Legal F. 403 (2003) ....................................................................10

Cornerstone Research, *Shareholder Litigation Involving Acquisitions of Public Companies:
   Review of 2015 and 1H 2016 M&A Litigation* (2016)..........................................4

*Cornerstone Research, Shareholder Litigation Involving Acquisitions of Public Companies:
   Review of 2015 and 1H 2016 M&A Litigation* (2016)..........................................4

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
   62 Vand. L. Rev. 1623 (2009) ........................................................................10

4 NEWBERG ON CLASS ACTIONS § 13:54 (5th Ed. 2016) ....................................... 22-23

MANUAL FOR COMPLEX LITIGATION, FOURTH § 21:62............................................................ 22-23

Objector Sean J. Griffith ("Professor Griffith" or "Objector"), a member of the Class, as that term is defined in the Stipulation,[1] respectfully submits this Objection to Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fee and Expenses (the "Objection"). Professor Griffith asks this Court to reject the Parties' settlement (the "Settlement"), refuse to certify a class, and decline to award attorneys' fees to Plaintiffs' Counsel. Objector further asks that the Court retain jurisdiction to consider an award of fees to counsel for Objector ("Objector's Counsel").

## I.   INTRODUCTION

Plaintiffs seek approval of a class of settlement subject to "continued disfavor" in the Seventh Circuit, the Delaware Court of Chancery, and other courts across the nation: the disclosure settlement. Plaintiffs initiated litigation "designed to end—and very quickly too—in a settlement in which class counsel receive fees and the shareholders receive additional disclosures concerning the proposed transaction." *In re Walgreen Co. Stockholder Litigation*, ___ F.3d. ___, 2016 WL 4207962, at *1 (7th Cir. Aug. 10, 2016) (reversing and remanding approval of disclosure settlement). Until recently, these "routine disclosure-only settlements, entered into quickly after ritualized quasi-litigation, . . . plague[d] the M&A landscape." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015). Starting in 2015, however, courts in New York, Delaware, and elsewhere began to subject these settlements to increased scrutiny. In August of this year the Seventh Circuit added its voice to this chorus. Judge Posner did not mince words:

> The type of class action illustrated by this case—the class action that yields fees for class counsel and nothing for the class—is no better than a racket. It must end.

---

[1] "Stipulation" refers to the Stipulation and Agreement of Compromise, Settlement, and Release filed on July 19, 2016 in this litigation. Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation.

2016 WL 4207962, at *3.  Although Plaintiffs make little reference to this precedent, and entirely omit relevant authority that lead to the Seventh Circuit's decision in *Walgreen*, the proposed Settlement is of a kind with those rejected in other actions.  The Supplemental Disclosures offered as consideration in the Settlement provided little or no value to stockholders who overwhelmingly approved the merger; the Release provided in exchange for such disclosures is vastly overbroad; and Plaintiffs have not demonstrated that they conducted a sufficient investigation of the claims they seek to release.  For these reasons, and as more fully set forth below, the Court should reject the Settlement, decline to certify the class, and refuse to award fees to Plaintiffs' Counsel.

## II.    DISCLOSURE SETTLEMENTS HAVE FALLEN INTO DISFAVOR

Plaintiffs' conduct in this litigation should be considered within the context of the dramatic rise in deal litigation that took place over the last decade, and the resulting pushback from jurists across the country.  Between 2005 and 2014, the percentage of major mergers and acquisitions valued at $100 million or more that triggered stockholder litigation more than doubled, from 39.3% in 2005 to a peak of 94.9% in 2014.  *See In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 894 (Del. Ch. 2016).  This litigation proved lucrative to the plaintiffs' bar because the threat of an injunction preventing deal closing provided defendants with an "incentiv[e] to settle quickly in order to mitigate the considerable expense of litigation and the distraction it entails, to achieve closing certainty, and to obtain broad releases as a form of 'deal insurance.'"  *Trulia*, 129 A.3d at 886.

The vast majority of such cases settled, as here, with no monetary consideration flowing to the class.  *Id.* at 894.  Although the occasional merger dispute generated economic benefits, "far too often such litigation serve[d] no useful purpose for stockholders" and instead "serve[d] only to generate fees for certain lawyers who are regular players in the enterprise of routinely filing hastily drafted complaints on behalf of stockholders on the heels of the public announcement of a

deal and settling quickly on terms that yield no monetary compensation to the stockholders they represent." *Id*. at 891-92.

This deal litigation posed a challenge to courts, in part, because disclosure settlements were generally heard "without the benefit of hearing opposing viewpoints" and "when little or no motion practice has occurred and the discovery record is sparse . . . ." *Id*. at 893. This process "often requires that the Court become essentially a forensic examiner of proxy materials so that it can play devil's advocate in probing the value of the 'get' for stockholders in a proposed disclosure settlement." *Id*. at 894. As the *Trulia* court described it:

> It is all too common for a plaintiff to identify and obtain supplemental disclosure of a laundry list of minutiae in a financial advisor's board presentation that does not appear in the summary of the advisor's analysis in the proxy materials—summaries that commonly run ten or more single-spaced pages in the first instance. Given that the newly added pieces of information were, by definition, missing from the original proxy, it is not difficult for an advocate to make a superficially persuasive argument that it is better for stockholders to have more information rather than less. In an adversarial process, defendants, armed with the help of their financial advisors, would be quick to contextualize the omissions and point out why the missing details are immaterial (and may even be unhelpful) given the summary of the advisor's analysis already disclosed in the proxy. In the settlement context, however, it falls to law-trained judges to attempt to perform this function, however crudely, as best they can.

*Id*. What is true in Delaware is doubly true elsewhere. While few litigators would dare present a disclosure settlement to the Court of Chancery without mentioning, and attempting to distinguish, *Trulia*, outside of Delaware plaintiffs' counsel submit papers that, as here, make frequent citation to Delaware case law without mentioning more recent authority.

This ubiquitous deal litigation attracted the criticism of both courts and academics. *Id*. at 895-96. Between 2014 and 2016, a number of courts issued decisions subjecting disclosure settlements to greater scrutiny, sometimes rejecting them altogether. *See id*. at 895-96 nn. 35 & 36 (citing two New York and four Delaware decisions rejecting, or reluctantly approving,

disclosure-only settlements). These cases culminated in the Delaware Court of Chancery's *Trulia* decision, a 42-page opinion in which Chancellor Bouchard described at length the perverse incentives, in particular the willingness of courts to approve disclosure settlements of marginal value, that had "caused deal litigation to explode in the United States beyond the realm of reason." *Id*. at 894. As explained more fully below, the *Trulia* court announced a new procedure for reviewing disclosure settlements and noted that, going forward, such settlements would be subject to "continued disfavor." See *id*. at 891-99.

Following *Trulia*, two trends emerged in merger litigation. First, the rate of state law mergers and acquisitions litigation experienced a dramatic decline, falling to 64% of all large transactions—the first time since 2009 that the rate dipped under 90 percent.[2] However, federal M&A filings increased 167 percent between the last half of 2015 and the first half of 2016, which Cornerstone Research attributed to a shift in venue for merger objection lawsuits following *Trulia*.[3] While pre-*Trulia* suits tended to be brought in state courts alleging state-law fiduciary duty actions, entrepreneurial plaintiffs have the option of proceeding, as here, in federal court by bringing actions under the federal securities laws. As the Cornerstone Reports demonstrate, such suits are becoming more common.

The Seventh Circuit, however, now stands against this trend. In *In re Walgreen*, the Seventh Circuit endorsed the Delaware Court of Chancery's reasoning regarding disclosure settlements to an action arising out of both federal securities law (as with Plaintiffs' case here) and

---

[2] *See* Cornerstone Research, *Shareholder Litigation Involving Acquisitions of Public Companies: Review of 2015 and 1H 2016 M&A Litigation* 2 (2016), *available at* https://www.cornerstone.com/Publications/Reports/Shareholder-Litigation-Involving-Acquisitions-2016.

[3] *See* Cornerstone Research, *Securities Class Action Filings: 2016 Midyear Assessment* 10 (2016), *available at* https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Filings-2016-Midyear-Assessment.

state law breach of fiduciary duty claims.[4]  In so doing, the Seventh Circuit applied Delaware's "clearer standard for approval of such settlements" set forth in *Trulia*:

> [P]ractitioners should expect that disclosure settlements are likely to be met with continued disfavor in the future unless the supplemental disclosures address a ***plainly material misrepresentation or omission***, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently. In using the term "plainly material," I mean that it should not be a close call that the supplemental information is material as that term is defined under Delaware law. Where the supplemental information is not plainly material, it may be appropriate for the Court to appoint an amicus curiae to assist the Court in its evaluation of the alleged benefits of the supplemental disclosures, given the challenges posed by the non-adversarial nature of the typical disclosure settlement hearing.

*Walgreen*, 2015 WL 4207962, at *4, *quoting Trulia*, 129 A.3d at 898-99.  Further, the Seventh Circuit made clear that "[I]t's not enough that the disclosures address the misrepresentation or omissions: they must correct them."  *Id*. at 5.

Plaintiffs cite *Walgreen* briefly in their memorandum in support of settlement ("Plaintiffs Memorandum" or "Pls. Mem."), but they make no reference to this sea-change in treatment of disclosure settlements by the Seventh Circuit and other courts.[5]  As set forth more fully below, the Settlement in this case strongly resembles the one rejected in *Walgreen*, and the Seventh Circuit's analysis is fatal to Plaintiff's Motion.

---

[4] *See* Class Action Complaint, *Hays v. Babiak*, No. 1:14-cv-09786 (N.D. Ill.), filed Dec. 5, 2014, attached hereto as Einterz Ex. 1.  The *Walgreen* plaintiffs brought four claims for relief under federal securities laws, and two under state law fiduciary duty theories.  *See id.* ¶¶ 123-166.

[5] Plaintiffs' sole citation to *Walgreen* occurs on page 12 of their Memorandum:

> As further articulated in [*Walgreen*], under these circumstances, the trial court judge should ask whether the [supplemental disclosures] "*would* be *likely* to matter to a reasonable investor."

(emphasis in original).

## III.     BACKGROUND TO THE LITIGATION

### A.     Plaintiffs File Suit and Quickly Offer to Settle

This litigation is typical of "cases in which a large public company announces an agreement that requires shareholder approval to acquire another large company, and a suit, often a class action, is filed on behalf of shareholders of one of the companies for the sole purpose of obtaining fees for the plaintiffs' counsel." *Walgreen*, 2016 WL 4207962, at *1.  Mere days after Defendants released the Definitive Proxy, Plaintiffs filed their lawsuits and settled shortly thereafter.

On July 13, 2015, Remy announced that it had entered into an acquisition agreement with BorgWarner Inc. ("Borg Warner"), pursuant to which Remy would receive $29.50 in case in exchange for each share of Remy common stock.  Smith Decl. ¶ 6.[6]  The merger consideration represented a premium of approximately 43.7% to the closing price of Remy's common stock on July 10, 2015, the last trading day prior to the public announcement of the execution of the merger agreement.  Def. Proxy at 12.[7]

Shortly after the announcement of the merger, Plaintiffs filed three actions asking "primarily or even exclusively for disclosure of details of the proposed transaction. . . ." *Walgreen*, 2016 WL 4207962, at *1.  At least one complaint explicitly alleged that Defendants had violated their fiduciary duties to stockholders such that the class would not receive fair value for their shares.[8]  Nevertheless, Plaintiffs decided not to pursue fiduciary duty claims, instead seeking relief only under Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

---

[6] "Smith Declaration" refers to the Declaration of Evan J. Smith in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses, filed by Plaintiffs on October 5, 2016.

[7] The Definitive Proxy is attached at Einterz Decl. Ex. 2.  The Supplemental Disclosures are attached at Einterz Decl. Ex. 3.

[8] *See* Bushansky Compl. ¶ 84 ("As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of

Plaintiffs' decision to forgo fiduciary duty claims may be explained as a choice of forum. By no later than April 30, 2015, Remy had adopted a forum selection provision in its certificate of incorporation providing that the Delaware Court of Chancery would be the "sole and exclusive forum for . . . any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders. . . ."[9]   Yet by August 2015, the Delaware Courts had already begun to openly criticize, and sometimes reject, disclosure settlements.  *See Trulia*, 129 A.3d at 895-96 n.35 (listing cases).  Simply put, Delaware might not have been fertile ground for a quick settlement.

Instead of pursuing fiduciary duty claims, Plaintiffs waited to initiate litigation until Defendants filed the Definitive Proxy with the SEC on August 18, 2015.[10]   Settlement followed swiftly thereafter.  On August 31, 2015, less than ***seven days*** after filing the first complaint, and the day before Plaintiff Garcia had even filed his action, Plaintiffs sent a written settlement demand to Defendants.  *See* Pls. Mem. at 4; Smith Decl. ¶ 10.

### B.   The Parties Settle Quickly for Supplemental Disclosures, and Remy Stockholders Overwhelmingly Approve a Premium Transaction

The Plaintiffs then claim to have entered into "arm's length negotiations" to settle their actions.  *See* Pls.' Mem. at 4-5. Two weeks later, on September 14, 2015, the Parties agreed to a Memorandum of Understanding (the "MOU") describing a proposed settlement of the Actions. *Id*. at 5.  Under the MOU, Defendants agreed to issue certain Supplemental Disclosures, described

---

Remy's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.")

[9] *See* Restated Certificate of Incorporation of Remy Int'l, Inc., Remy Int'l. 10-Q, Ex. 3.2, filed with the SEC on May 6, 2015 (attached as Einterz Decl. Ex. 4).

[10] Confusingly, Plaintiffs' Memorandum maintains that "[f]ollowing the filing and dissemination of the *Preliminary Proxy*, three putative class actions were filed by certain stockholders of Remy. . . ." Pls. Mem. at 4 (emphasis added). In fact, each Plaintiff filed their complaints after the *Definitive Proxy* had been published.  *See* Phillips Compl. (filed August 25, 2015); Bushansky Compl. (filed August 27, 2015); Garcia Compl. (filed Sept. 1, 2015).

more fully below,[11] but provided the Class with no additional monetary consideration nor alteration of the terms of the transaction.

The Supplemental Disclosures dissuaded few, if any, of Remy's stockholders to vote against a merger offering a 43.7% premium.  On September 22, 2015, over 99.1% of the voting shares were voted in favor of the Merger Agreement, with 25,349,958 shares voting to approve, as opposed to 10,997 voted against and 217,737 abstentions.  *See* Remy 8-K (filed Sept. 22, 2015) (attached as Einterz Ex. 5 hereto).  Plaintiffs do not appear to have disclosed if, or how, they voted on the merger.

### C.    Plaintiffs' Investigation

At some point before Remy stockholders voted on the transaction, Plaintiffs reviewed "core documents," including minutes of Remy board meetings and presentations to the Remy board by UBS.  Pls.' Mem. at 5.  Such documents are among the "standard categories of documents that defendants routinely produce to facilitate a disclosure-only settlement."  *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1121 (Del. Ch. 2011) (describing typical core documents to include board minutes and financial presentations).

Following entry into the MOU, Plaintiffs conducted further "Confirmatory Discovery" consisting of unspecified "thousands" of pages of non-public documents, along with the deposition of a single financial advisor to Remy.  Smith Decl. ¶ 14.  Plaintiffs' work here fits the description given by the Delaware Court of Chancery in *Trulia*:  "[G]iven that plaintiffs' counsel already have resigned themselves to settle on certain terms, confirmatory discovery rarely leads to a renunciation of the proposed settlement and, instead, engenders activity more reflective of "going through the motions."  *Trulia*, 129 A.3d at 893 n.24.  Notably, Plaintiffs do not purport to have

---

[11] *See* Section IV.A, *infra*.

deposed *any* of the Defendants, despite having alleged that "the conflicted Board and senior management of the Company failed to properly shop the Company. . . ."  Phillips Compl. ¶ 26.

Following confirmatory discovery, Plaintiffs moved for preliminary approval of the settlement on July 22, 2016, which was granted on July 27, 2016.  Smith Decl. ¶¶ 17-18.

### D.    The Plaintiffs and the Objector

Before addressing the substance of the Settlement, it is worth considering the litigation history of the Plaintiffs as well as the Objector.  While two of the three Plaintiffs filed certifications stating that they had not sought to serve as lead plaintiff in a federal securities action in the last three years, this does not tell the whole story.[12]  At least two of the three plaintiffs appear to be frequent filers of class litigation.[13]  Between 2014 and the present, a person named Stephen Bushansky has appeared as a class plaintiff on dockets in at least 10 class or derivative actions, while a person named Maxine Phillips has appeared on at least five.  *See* Einterz Decl. Ex. 6. While Objector leaves it to the Court's discretion as to whether the Court will inquire as to the frequency with which Plaintiffs file similar suits or reach similar settlements, Objector's Counsel compiled this information in the anticipation that Plaintiffs will assert that Professor Griffith, due to his litigation history, is a "professional objector."[14]

---

[12] *See* Certification of Proposed Lead Plaintiff, *Phillips v. Remy Int'l*, Civ. No. 1:15-cv-1343-TWP-TAB, Dkt. #6 ¶ 6 (filed Sept. 3, 2015) (stating that Plaintiff has not sought to serve or served as a representative party in a federal securities action); Certification of Proposed Lead Plaintiff, *Garcia v. Remy Int'l*, Civ. No. 1:15-cv-1385-TWP-TAB, Dkt. #6 ¶ 5 (filed Sept. 3, 2015).  Objector has been unable to find a similar certification for Plaintiff Bushansky on the docket.

[13] *See* Einterz Decl. Ex. 6

[14] Class action attorneys sometimes attempt to discredit objections through *ad hominem* accusations regarding the objector or objector's counsel's status as a "professional objector."  Indeed, certain of Plaintiffs' Counsel made such allegations regarding Professor Griffith in *Vergiev v. Aguero*, in which a New Jersey court agreed with Professor Griffith and, applying the reasoning in *Trulia*, rejected a proposed settlement.  *See Vergiev*, Docket No. L-2276-15, at 3 (N.J. Sup. Ct.—Union Cty. June 5, 2016) (attached as Einterz Decl. Ex. 7).

In anticipation of this argument, it is perhaps relevant to distinguish the present effort from those to whom the term is most often applied.  A "professional objector" is a term of art referring to attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees.  Some courts presume that

Professor Griffith, on the other hand, is an activist investor who has served as a watchdog at the forefront of the movement to curtail abusive M&A litigation. As he has publicly discussed, Professor Griffith began supplementing his academic writing on mergers and acquisitions class actions in late 2014 and early 2015 by purchasing small holdings in companies that had announced mergers or tender offers.[15]  As part of this project, Professor Griffith has served as an objector in multiple cases across the country, including the Delaware Court of Chancery's groundbreaking decision in *In re Riverbed Tech., Inc. S'holders Litig.*, 2015 WL 5458041 (Del. Ch. Sept. 17, 2015), and a recent New Jersey case in which a state court adopted the reasoning of *Trulia* and rejected a disclosure settlement.  *See* Order and Judgment, and Statement of Reasons, *Vergiev v. Aguero*, Docket No. L-2276-15 (N.J. Sup. Ct.—Union Cty. June 5, 2016) (attached as Einterz Decl. Ex. 7). Professor Griffith also provided an *amicus curiae* brief in the *Trulia* case.  *See* 129 A.3d at 890.

Professor Griffith, having purchased his shares of Remy stock on August 4, 2015, is a member of the purported Class.  *See* Einterz Decl. Ex. 8 (showing holdings).  Professor Griffith holds the T. J. Maloney Chair in Business Law at the Fordham University School of Law.  His *curriculum vitae* is provided at Einterz Decl. Ex. 9.

---

such objectors' legal arguments are not made in good faith. See Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n.150 (2003).

Neither Professor Griffith nor his counsel engage in such tactics:  they do not extort attorneys in exchange for withdrawing objections, nor have they ever withdrawn an objection in exchange for payment.  No court has ever ruled that Professor Griffith is a "professional objector."  To the contrary, the Delaware Court of Chancery has found his submissions to be beneficial to other class members.  *See In re Riverbed, Inc. S'holders Litig.*, 2015 WL 7769861, at *2 (Del. Ch. Dec. 2, 2015).

Nonetheless, to the extent that the Court is concerned about any possible accusations of bad faith, Professor Griffith is willing to stipulate to an injunction prohibiting him or his attorneys from accepting compensation in exchange for the settlement of this objection without court approval. See Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem).

[15]  *See* Alison Frankel, *Law Prof Objects to Delaware M&A Settlement, Could Be First of Many*, at http://blogs.reuters.com/alison-frankel/2015/07/14/law-prof-objects-to-dela-ma-settlement-could-be-first-of-many/ (July 14, 2015).

## IV.    THE COURT SHOULD REJECT THE PROPOSED SETTLEMENT

Examined in light of the Seventh Circuit's reversal of a settlement approval in *Walgreen*, the proposed Settlement should be rejected.   When considering the "historically trodden but suboptimal path" of disclosure settlements:

> [P]ractitioners should expect that disclosure settlements are likely to be met with continued disfavor in the future unless the supplemental disclosures address a ***plainly material misrepresentation or omission***, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently.

*Walgreen*, 2016 WL 4207962, at *4, *quoting Trulia*, 129 A.3d at 898-99.   Thus, for Plaintiffs Motion to be granted, Plaintiffs must demonstrate that the Settlement (i) offered plainly material disclosures to Remy stockholders; (ii) contains a narrowly circumscribed release of claims; and (iii) releases only claims that have been adequately investigated.   The proposed Settlement clears none of these hurdles.

### A.    The Supplemental Disclosures are Not Plainly Material

A disclosure may only support a settlement if it is "plainly material," such that it "should not be a close call that the supplemental information is material as that term is defined under Delaware law."  *Id*. at *4.   Before addressing the individual disclosures relied upon in Plaintiff's Memorandum, it is worth mentioning two facts that demonstrate the collective immateriality of the Supplemental Disclosures.

*First*, the Remy stockholders approval of the transaction by a majority of 99.1% of voting shares shows that the Supplemental Disclosures did little, if anything, to affect the stockholder vote.   Indeed, Remy stockholders showed greater enthusiasm than even the stockholders in *Walgreen*.  *See* 2016 WL 4207962, at *3 ("The reorganization that ratified Walgreens Boots Alliance was approved by 97 percent of the Walgreens shareholders who voted.").   Just as in

*Walgreen*, "it is inconceivable that the . . . disclosures added by the settlement agreement either reduced support for the merger by frightening the shareholders or increased that support by giving the shareholders a sense that now they knew everything." *Id.*

*Second*, Plaintiffs—and their investigation—fail to address an obvious question: if the Supplemental Disclosures were plainly material, ***why did Defendants not disclose them in the Definitive Proxy statement***? Remy's directors were advised by highly-skilled attorneys, and the Definitive Proxy was presumably a heavily-lawyered document. If Plaintiffs' claims had merit—and they do not—then through the omission of these facts ***someone*** has inflicted upon Remy, at the very least, the costs of this litigation. Yet Plaintiffs offer no explanation as to how such supposedly obvious omissions occurred, why they were made, or who might be responsible. This question applies to each and every Supplemental Disclosure—and goes unanswered.

### 1.   The Supplemental Disclosures Relating to Remy's Financial Projections are Not Plainly Material

Contrary to Plaintiffs' assertion, there is no bright-line rule, in Delaware or elsewhere, requiring the disclosure of unlevered free cash flows, or holding that such disclosures are always plainly material.

Under well-established law, when directors of a Delaware corporation rely upon the advice of a financial advisor in making a decision that requires stockholder action, the stockholders are entitled to receive a *fair summary* of the substantive work performed by an investment banker which the board relied upon in making its recommendation to stockholders. *See In re Pure Res., Inc. S'holder Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002). A fair summary, however, is merely that: a *summary*. It need not contain all of the information underlying the financial advisor's opinion or all of the information the advisor utilized in preparing its report to the board. *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *11 (Del. Ch. Feb. 29, 2012) ("Shareholder are entitled

to a fair summary of the substantive work performed by the investment bankers, but Delaware courts have repeatedly held that a board need not disclose specific details of the analysis underlying a financial advisor's opinion."). To establish materiality, a plaintiff stockholder must "explain why receiving information in addition to the basic financial data already disclosed will significantly alter the total mix of information available." *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007).

Plaintiffs fail to demonstrate the Supplemental Disclosures in fact significantly altered the mix of information available to Remy's stockholders, who enthusiastically approved the transaction despite this disclosure. The Definitive Proxy already contained over four pages of detailed information regarding the Company's financial forecasts. *See* Def. Proxy at 45-49. This summary included estimates of revenue, adjusted EBITDA, depreciation and amortization expenses, capital expenditures, and a description of assumptions underlying these financial forecasts relating to potential sales growth and exchange rates. *Id.* While the unlevered free cash flows, which would allow a stockholder to recreate a DCF analysis, might be *useful*, "[o]mitted facts are not material simply because they might be helpful." *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170 (Del. Ch. 2000). Directors need not disclose "all financial data needed to make an independent determination of fair value. . . ." *See CheckFree*, 2007 WL 3262188, at *2, *quoting In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *13 (Del.Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del.2006). *Accord Trulia*, 129 A.3d at 905 n.79 ("A fair summary, however, does not require disclosure of sufficient data to allow stockholders to perform their own valuation.").

Furthermore, although Plaintiffs' memorandum appears to suggest that the unlevered free cash flows included in the Supplemental Disclosures were "created by management and relied

upon by UBS," *see* Pls. Mem. at 12, it is far from clear that this is the case. With regard to unlevered free cash flows, the Definitive Proxy states that:

> UBS performed an illustrative discounted cash flow analysis of the Company utilizing financial forecasts and estimates prepared by the Company's management, and ***UBS's calculation of unlevered free cash flows*** (calculated as earnings before interest, taxes, depreciation and amortization, referred to in this section of the proxy statement as EBITDA, less unlevered taxes, less total capital expenditures, less increases in working capital and less restructuring charges) based on such financial forecasts and estimates.

Def. Proxy. at 41. Nothing in the Supplemental Disclosures changes this conclusion or represents that the free cash flows presented were calculated by management. *See* Supp. Disc. at 7 ("Set forth below is a ***derivation of unlevered free cash flow from Adjusted EBITDA***." (emphasis added)).

Plaintiffs fail to distinguish between unlevered free cash flow calculations provided by management—the subject of *Maric*, relied upon by Plaintiff[16]—and similar figures calculated by bankers on the basis of disclosed information provided by management. Delaware courts have consistently, and as recently as September 2016, held that where a proxy discloses a fair summary of the information provided to bankers by management, a proxy need not disclose figures derived by the bankers, including unlevered free cash flow calculations. *See Nguyen v. Barrett*, 2016 WL 5404095, at *4 (Del. Ch. Sept. 28, 2016). *See also Nguyen v. Barrett*, 2015 WL 5882709, at *4 (Del. Ch. Oct. 8, 2015), *aff'd* 2015 WL 5924668 (Del. Oct. 9, 2015) ("Our case law provides that, ***where the bankers derive unlevered, after-tax free cash flows*** rather than relying on management projections, the inputs on which they rely are not ***per se*** subject to disclosure." (emphasis added)).

Thus, Defendant's decision not to disclose this information in the Definitive Proxy is consistent with Delaware case law. The lack of materiality is emphasized by Plaintiffs' failure to

---

[16] *See In re Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178-79 (Del. Ch. 2010) ("the proxy statement for some inexplicable reason excised the free cash flow estimates that ***had been made by PLATO's management*** and provided to" the bankers (emphasis added)).

explain why, if this information was in fact "plainly material," Defendants did not include it in the Definitive Proxy.  All of the cases that Plaintiffs cite in support of their claims to materiality were decided well before 2015, and it would be unreasonable to assume that Defendants' top-tier legal advisors were unaware of them.  While Defendants—who stand to benefit from a generous release of claims—have remained silent with regard to Plaintiffs' Motion, their initial decision not to disclose this information speaks volumes.

## 2.   The Supplemental Disclosures Relating to UBS' Financial Analyses are Not Plainly Material

Plaintiffs' arguments regarding additional material related to UBS' valuation analyses and fairness opinion fare no better.  As set forth above, additional information regarding unlevered free cash flows did not alter the total mix of information available to stockholders regarding the UBS analysis.  The remaining supplemental disclosures relating to the UBS analysis concern the individual multiples provided with regard to the companies addressed in UBS's *Selected Publicly Trading Companies Analysis* and *Selected Transactions Analysis.*  Unfortunately for Plaintiffs, the Court of Chancery recently addressed precisely this type of disclosure in *Trulia*.  Indeed, the *Trulia* court directly distinguished some of the very cases relied upon by Plaintiff.[17]

In *Trulia*, as here, the original proxy disclosed (i) the names of companies used in a selected public trading companies analysis and a selected transactions analysis, and (ii) summary statistics for the companies selected.  *Compare Trulia*, 129 A.3d at 904-906 *with* Definitive Proxy at 42-43, 44.  Just as here, the *Trulia* plaintiffs argued that the omission of individual multiples for each of the selected companies constituted a material omission.  *Trulia*, 129 A.3d at 904, 905-06.  Yet the *Trulia* court, after pointing out that much of the information regarding individual company

---

[17] *See Trulia*, 129 A.3d at 906 n.82 (distinguishing *Turberg v. ArcSight*, C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011) by noting that "unlike here, no summary multiples were initially provided to stockholders.").

multiples was publicly available, expressly held that individual multiples with regard to the selected transaction analysis amounted to "trivialities that [were] not helpful." *Id*.  With regard to the selected public companies analysis, the court held that such multiples were not "material or even helpful in this case."  *Id*.

Plaintiffs' failure to engage with either *Walgreen* or *Trulia*, and reliance instead on outdated Delaware law directly distinguished by more recent authority, is fatal to their assertions of materiality of these disclosures.

### 3.   The Supplemental Disclosures Concerning the Background of the Merger are Not Plainly Material

Finally, Plaintiffs' arguments regarding the materiality of disclosures of purported conflicts of interest on the part of Defendant Ruchim and UBS have no merit.  With regard to Defendant Ruchim, the text of the Supplemental Disclosure indicates that this information was almost entirely redundant:

> *As disclosed* on page 10 of the Proxy Statement on Schedule 14A filed by the Company with the SEC on April 30, 2015, Company director Arik W. Ruchim is a partner of H Partners Management, LLC. *As shown on page 90 of the Definitive Proxy Statement*, based solely on information currently available to the Company from filings with the SEC on Schedules 13D and 13G filed prior to August 14, 2015, H Partners, taken as a whole, was the second largest stockholder of the Company as of August 14, 2015.

Supp. Disc. at 2 (emphasis added).  The Definitive Proxy had already disclosed that Ruchim was "an employee of Company shareholder H Partners. . . ."[18]  Def. Proxy. at 29.  The fact that Ruchim was a partner of at least one H Partners entity, as well as an employee, would not have significantly altered the total mix of information available to stockholders, even assuming that this information had not already been disclosed a few months earlier.  As for the revelation that H Partners was the

---

[18] The Proxy collectively referred to H Partners Management LLC, H Partners LP, H Partners Capital, LLC P H Partners Ltd., H Offshore Fund Ltd. And Rehan Jaffer.  *See* Def. Proxy at 2.

second largest stockholder in Remy, shareholders could deduce this simply by turning to page 90 of the Definitive Proxy, observing the list of entities with a beneficial ownership of greater than five per-cent, and then noting that there were only two such entities and that FMR LLC held more shares than H Partners.

The Supplemental Disclosure regarding UBS's purported conflict is no more material, as can be demonstrated by comparing the new information to what was already disclosed in the Definitive Proxy:

> Under the terms of UBS' engagement, the Company agreed to pay UBS for its financial advisory services in connection with the merger an aggregate fee currently estimated to be approximately $8.6 million, a portion of which has been paid in connection with UBS' opinion and approximately $7.6 million of which is contingent upon consummation of the merger. In addition, the Company agreed to reimburse UBS for its reasonable expenses, including fees, disbursements and other charges of counsel, and to indemnify UBS and related parties against liabilities, including liabilities under federal securities laws, relating to, or arising out of, its engagement. In the past, UBS and its affiliates have provided investment banking and financial advisory services to the Company unrelated to the merger, for which UBS and its affiliates received compensation, including having acted as financial advisor to the Company in its 2014 transaction with Fidelity National Financial, Inc. and Joint Lead Arranger and Bookrunner in the refinancing of the Company's debt facility in 2013, <u>for which UBS received aggregate fees of approximately $1.0 million and $0.45 million, respectively.</u> In the ordinary course of business, UBS and its affiliates may hold or trade, for their own accounts and the accounts of their customers, securities of the Company and Parent and, accordingly, may at any time hold a long or short position in such securities. <u>UBS has neither performed services for nor collected any fees from Parent since January 1, 2013.</u>

Supp. Discl. at 5 (additional text underlined).  Neither of these disclosures rise to the level of materiality, let alone are they "plainly material."  *First*, Delaware law does not require the disclosure of events that did not occur:  "If a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen." *In re Sauer-Danfoss*, 65 A.3d at 1132.  Thus, the disclosure that UBS had ***not*** performed services could not be material.

Nor would a reasonable investor find it material that UBS had been paid relatively trivial amounts with regard to already-disclosed transactions that took place in prior years.

The cases cited by Plaintiff are readily distinguishable, as they all involved either (i) conflicts of interest arising from fees paid to, or potentially offered to—a buyer's financial advisor by the **_seller_**, or (ii) situations where the financial advisor had some significant outside investment interest in the target.  *See In re John Q. Hammons Hotel*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2008) (target's financial advisor had possibility of underwriting $700 million in commercial mortgage-backed securities by buyer); *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 28, 2008) (financial advisor held significant warrants and convertible notes in target); *In re Art Tech. Grp., Inc. S'holders Litig.*, C.A. No. 5955-VCL at 101-02 (Del. Ch. Dec. 21, 2010) (Smith Decl. Ex. 8) (requiring disclosure of sell-side banker's past engagement fees from buyer).

As set forth above, none of the Supplemental Disclosures discussed in Plaintiffs' Memorandum, nor any of the other Supplemental Disclosures, are plainly material, and for that reason alone the Court should reject the Settlement.[19]

### B.      The Release is Overbroad

Aside from the immateriality of the Supplemental Disclosures, the Settlement should not be approved because the release is far from "narrowly circumscribed to encompass **_nothing more_** than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows

---

[19] Plaintiffs secured, but do not rely upon in their Memorandum, a number of disclosures regarding the **_non-existence_** of (i) other potential acquirers; (ii) agreements that would preclude potential acquirers from making an offer; and (iii) discussions between Company management and the buyers regarding the manager's continued employment.  *See* Supp. Disc. at 5.  To the extent plaintiffs have not waived any arguments regarding the materiality of these disclosures, the rule expressed in *Sauer-Danfoss* applies to them as well:  directors are not required to disclose the non-existence of events that did not occur.  *See* 65 A.3d at 1132.

that such claims have been investigated sufficiently." *Walgreen*, 2016 WL 4207962, at *4, *quoting Trulia*, 129 A.3d at 898-99 (emphasis added).

Despite having pursued only federal securities law claims, Plaintiffs purport to release any claim based on "state, local, foreign, federal, statutory, regulatory, common or other law or rule. . . ."   Stipulation ¶1(i).   Far from being limited to investigated claims, it extends to claims "known *or unknown*, disclosed *or undisclosed*, accrued *or unaccrued*, apparent *or not apparent*, foreseen *or unforeseen*, matured or not matured, suspected *or unsuspected*, liquidated or not liquidated, fixed or contingent, *including Unknown Claims*. . . ."   *Id.* (emphasis added).   The Release purports to give up any claims relating to "the fiduciary obligations of the Released Parties in connection with the Merger," despite the fact that such claims should have properly been brought before the Delaware courts.   *Id.*   While the Release specifically draws seven broad categories of claims within in its ambit, it is not limited to those categories, but includes "without limitation" any claims "that were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved, or referred to in, or related to, directly or indirectly, in the Actions. . . ."   *Id.*

Moreover, the broad definitions contained in the release serve to eliminate the claims of Class Members against non-parties who potentially face liability were Plaintiffs correct regarding the materiality of the Supplemental Disclosures.   Under the terms of the Settlement, "Released Parties" includes not only the Defendants, but each of their "financial or investment advisors, advisors, consultants, investment bankers, entities providing any fairness opinion, underwriters, brokers, dealers, lenders, commercial bankers, attorneys, personal or legal representatives, accountants, and associates. . . ."   *Id.* ¶ 1(j).   Yet if the Supplemental Disclosures are material enough to warrant approval of the Settlement under *Walgreen* or *Trulia*—that is to say, if the

materiality of these disclosures was never a "close call"—then it follows that whoever narrowed the scope of the Definitive Proxy may have inflicted upon Remy (and its stockholders, the Class), the costs arising from these Actions (such as a six-figure plaintiffs' fee), additional expenses arising from the need to defend this action, and the opportunity cost of management time.  The Court should not release claims, including derivative claims, which might be brought against agents of Remy when Plaintiffs have provided no explanation for (i) why the Supplemental Disclosures were omitted from the Definitive Proxy; (ii) who was responsible for those omissions; and (iii) why the Class lacks viable claims against those responsible.[20]

Similarly, due to its broad language, the Release appears to exempt Plaintiffs and Plaintiffs' Counsel from claims not only from Defendants, but also from the Class and its Members.[21]   Yet Defendants' investigation of claims against Plaintiffs appears to be non-existent:  there is no record of a single document produced by Plaintiffs or any Plaintiff depositions.  The logic underlying *Walgreen* and *Trulia*—that a Release should not abandon potentially meritorious claims in the absence of investigation—should likewise preclude the approval of a release of claims against Plaintiffs.

---

[20] Objector, of course, maintains that the Supplemental Disclosures are not material, and thus these claims are not viable.  The point is simply that to the extent the Settlement passes *Trulia*'s test for the "give", the Release fails the test for the "get."

[21] As drafted, the Release is so broad as to be potentially recursive, with the Class releasing any claims that it might have against itself, its members, Plaintiffs or Plaintiffs' Counsel.  To illustrate:

1.  Remy is a Defendant. See Stipulation at 2.

2.  "Released Parties" includes both Remy and any "past or present . . . shareholders. . . ." *Id*. ¶ 1(j).  Of course, every class member is a past stockholder of Remy, and thus a Released Party.

3.  As of the Effective Date, "each of the Released Parties shall be deemed to have, and by operation of the Judgment shall have fully, finally, and forever released, relinquished, and discharged Plaintiffs, Plaintiffs in the Actions, each of the Class Members and counsel for any Plaintiffs in the Actions from all claims . . . ." *Id*. ¶ 6.

Although counterintuitive, the Stipulation's literal reading appears to discharge any cause of action that any Class Member could have against Plaintiffs or Plaintiffs' Counsel arising from this action.

### C.   The Released Claims Have Not Been Adequately Investigated

Plaintiffs' investigation of the Released Claims, to the extent that it has been described at all, falls far short of even that found to be wanting in *Trulia*.  In that case, the Delaware Court of Chancery criticized litigation where:

> *[N]o motions were decided* (not even a motion to expedite), and discovery was limited to the production of less than 3,000 pages of documents and the *taking of three depositions*, two of which were taken before the parties agreed in principle to settle and *one of which was a "confirmatory" deposition* taken thereafter.

129 A.3d at 894 (emphasis added).  Here, plaintiffs sought only "the standard categories of documents that defendants routinely produce to facilitate a disclosure-only settlement" prior to executing the MOU.  *Sauer-Danfoss*, 65 A.3d at 1121.  Plaintiffs took *no* depositions before compromising their claims; took only *one* deposition in confirmatory discovery; and never conducted *any* depositions of a Defendant.  Plaintiffs are similarly vague about the scope of the documents received in Confirmatory Discovery, describing it as only "thousands of pages."  In short, nothing suggests that Plaintiffs' investigation meets even the minimal process criticized in *Trulia*.

### D.   The Other Factors Cited by Plaintiff Do Not Support Approval

Plaintiffs' Memorandum entirely omits discussion of the three factors considered key in *Walgreen* and *Trulia*—plain materiality of disclosures, a narrowly circumscribed release, and an adequate investigation of released claims—and instead focuses on factors that apply to settlements more generally, as set forth in *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997).  In many cases, these factors merely restate the more specific requirements of *Walgreen* discussed above.  Nevertheless, Plaintiffs settlement fares equally badly under these criteria.

### 1.     Plaintiffs Offered a Broad Release in
### Exchange for Weak Disclosures

The first two factors—(i) the strength of the plaintiffs' case on the merits measured against the terms of the settlement and (ii) the complexity, length, and expenses of continued litigation—do not weigh in favor of approval.  Although Plaintiffs now aver that their disclosure claims were strong, they made no attempts to litigate them before this Court, for instance by prosecuting a motion to enjoin the merger.  Rather, they initiated settlement discussions within ***seven days*** of filing their first lawsuit. Defendants' quick acquiescence to this tactic, through an exchange of trivial disclosures for a broad release of claims, should be seen for what it is:  an effort to avoid nuisance litigation.  Disclosure settlements tend to be reached closely before the stockholder vote not because this enhances judicial or litigation efficiency—such cases would be most efficient if they were never brought—but because this is the point during litigation when Plaintiffs have the most leverage.[22]  *See Trulia*, 129 A.3d at 892.

### 2.     The Court Should Take No Comfort
### From the Silence of the Class

The Court should not conclude from a lack of objections that the settlement is "supported," let alone "overwhelmingly," by the Class.  *See* Pls. Mem. at 24.  Objectors, and particularly well-represented objectors, are rare in disclosure settlements.  *See Trulia*, 129 A.3d at 892 n.23.  Federal courts have long recognized that silence does not always suggest consent, because where "the recovery for each class member is small, the paucity of objections may reflect apathy rather than

---

[22] As the *Trulia* court noted, "[P]laintiffs' leverage is the threat of an injunction to prevent a transaction from closing. Faced with that threat, defendants are incentivized to settle quickly in order to mitigate the considerable expense of litigation and the distraction it entails, to achieve closing certainty, and to obtain broad releases as a form of 'deal insurance.'  These incentives are so potent that many defendants self-expedite the litigation by volunteering to produce 'core documents' to plaintiffs' counsel, obviating the need for plaintiffs to seek the Court's permission to expedite the proceedings in aid of a preliminary injunction application and thereby avoiding the only gating mechanism (albeit one friendly to plaintiffs) the Court has to screen out frivolous cases and to ensure that its limited resources are used wisely." *Trulia*, 129 A.3d at 892.

satisfaction."  4 NEWBERG ON CLASS ACTIONS § 13:54 n.7 (5th Ed. 2016), *quoting* MANUAL FOR COMPLEX LITIGATION, FOURTH § 21:62.  Where, as here, monetary recovery is nonexistent and Plaintiffs waited over six months to even seek preliminary settlement approval, apathy is the more reasonable conclusion.

### 3. The Parties' Negotiation and the Endorsement of Class Counsel Deserve Little Weight

The Court should likewise give little weight to the fact that the parties negotiated a settlement, or the fact that Plaintiffs' Counsel have endorsed the same.  The Seventh Circuit has aptly described the dynamics leading to disclosure settlements like the one at bar.  These are deals in which:

> [T]he parties [have] agreed in order to settle the class action at nominal cost to the defendant (because class counsel's fees [are] small potatoes to the giant new company and the disclosures irrelevant to the shareholders and thus incapable of preventing the [transaction]) and sweet fees for class counsel, who devoted less than a month to the litigation, a month's activity that produced no value.

*Walgreen*, 2016 WL 4207962, at *4.  Over the last decade, as the disclosure settlement has "become the most common method for quickly resolving stockholder lawsuits that are filed routinely in response to the announcement of virtually every transaction," *Trulia*, 129 A.3d at 887, courts across the nation have placed less weight on the fact that the parties have agreed to eliminate settlements.  The Court should do so here, as well.[23]

## V.   THE PROPOSED SETTLEMENT CLASS SHOULD NOT BE CERTIFIED

In addition to rejecting the proposed settlement, the Seventh Circuit in *Walgreen* explained that "a class 'representative who proposes that high transaction costs (notice and attorneys' fees)

---

[23] Plaintiffs' arguments regarding the stage of proceedings and amount of discovery completed, *see* Pls. Mem. at 26-27, have been amply addressed through the consideration of the third *Walgreen* factor:  the adequacy of Plaintiff's investigation.  *See* Section IV.C, *supra*.

be incurred at the class members' expense to obtain [no benefit] . . . is not adequately protecting the class members' interests." 2016 WL 4207962, at *5, *quoting In re Aqua Dots Product Liability Litig.*, 654 F.3d 748, 752 (7th Cir. 2011).  For this reason alone, the Court should refuse to certify the class.

Further, the Court should consider adequacy of counsel in light of the *Walgreen* and *Trulia* courts' discussions of the imbalanced incentives exploited by stockholder plaintiffs during the litigation explosion in the early part of this century, and then consider how Plaintiffs Counsel have conducted litigation since those decisions were promulgated.  In particular, the Court should look with great skepticism at counsel who seek the approval of a disclosure settlement while citing only once to *Walgreen* and omitting mention of its principle holdings.  Likewise, despite citing to over **thirteen** cases from the Delaware Court of Chancery, Plaintiff neglects to mention *Trulia*, any recent Delaware case law skeptical of disclosure settlements, or indeed any Delaware case after 2009.

In reviewing disclosure settlements, "[t]he lack of an adversarial process often requires that the Court become essentially a forensic examiner of proxy materials so that it can play devil's advocate. . . ." *Trulia*, 129 A.3d at 894.  This task is made all the more difficult when representative plaintiffs fail to set forth recent authority directly on point, taking a tactical gamble that no objector will appear to challenge them.  Adequate counsel—let alone counsel deserving of a fee award— should be required to assist the Court in its analysis.

## VI.   THE COURT SHOULD REJECT THE FEE REQUEST

In consideration for these peppercorn disclosures, Plaintiffs now seek an award of $409,884.50 in attorneys' fees and expenses, unopposed by Defendants.  Pls. Mem. at 27. Although courts have awarded attorney's fees following class action settlements where a non-monetary benefit is conferred on the class, Objector respectfully suggests that this case does not

warrant such a result.  Plaintiffs have not demonstrated the key prerequisite for an award of fees under the common benefit doctrine—a substantial benefit.  For the reasons set forth above, the Supplemental Disclosures provided no benefit to Remy's stockholders.

Even were the Court to find that the Supplemental Disclosures provided some minimal benefit to the class, it would not justify "sweet fees for class counsel, who devoted less than a month to the litigation. . . ."  *Walgreen*, 2016 WL 4207962, at *4.  Plaintiffs' attempts to justify their fee request rely upon artificially inflated lodestar calculations, and as a result the fee request exceeds more recent fee awards in this Court and the Delaware Court of Chancery.

### A.      Plaintiffs' Lodestar is Artificially Inflated

To achieve quite limited results, Plaintiffs purport to have dedicated the efforts of ***five law firms***, engaging collectively ***27 separate timekeepers***, who all together aver that they spent ***531.9 hours*** prosecuting litigation that went from filed complaints to the first settlement demand in, at best, ***under a week***.[24]  *See* Section II.B., *supra*.  Nothing in the record suggests that any plaintiff ever attempted to remove the others from this consortium of trial attorneys—and why would they, when five separate law firms can present a greater lodestar?

Nor should the Court credit Plaintiffs' argument that the contingent nature of their compensation justifies a premium over hourly rates that already, in some cases, exceed $800.00.  *See* Pls. Mem. at 33.  In August 2015, when Plaintiffs filed their complaints, almost every major merger—nearly 95% of all large transactions—remained subject to a stockholder lawsuit, with the corporation settling quickly thereafter.  *See Trulia*, 129 A.3d at 891-92.  Plaintiffs filed their

---

[24] Plaintiffs' lodestar calculation and supporting data are set forth in the Smith Declaration ¶ 54-56 and Exhibits 1-5 thereto.

complaints with a near certainty of convincing Defendants to settle; the lack of risk mitigates against a multiplier to the lodestar.

### B.      Plaintiffs' Fee Request is Greater Than Justified by Other Actions

Finally, the Court should place little weight on the purportedly comparable cases selected by Plaintiffs to demonstrate that the fee request, and lodestar, are appropriate in this action.  As already discussed, fee requests in disclosure cases have typically been approved without adversarial dispute, and it is not surprising that one can find cases awarding an array of fees to the "regular players in the enterprise of routinely filing hastily drafted complaints. . . ." *Trulia*, 129 A.3d at 892.

Instead of relying upon examples selected by Plaintiffs, the Court could consider the analysis performed by Vice Chancellor Laster in *In re Sauer-Danfoss Inc. S'holders Litigation*, 65 A.3d 1116 (Del. Ch. 2011), in which the court gathered a collection of fee awards for disclosure settlements and divided them into three categories based upon plaintiff's efforts in litigation and the ultimate benefit derived from the settlement.  *Id*. at 1141-43.  That chart demonstrated that "[d]isclosures of questionable quality have yielded much lower awards."  *Id*. at 1136-37; *see also id.* at 1141-43 (illustrating fees in such cases ranging from $75,000 to $225,000).

## VII.   THE COURT SHOULD ALLOW OBJECTOR'S COUNSEL TO SUBMIT A FEE REQUEST

Finally, Objector asks that the Court retain jurisdiction over this matter to allow Objector to submit a fee request.  Objector's Counsel have expended considerable effort in researching the Settlement, reviewing Plaintiffs' submissions, and providing the Court with a truly adversarial context.  Courts have awarded Objectors' counsel with fee awards both in cases where an objection was successful, and where an unsuccessful objection nonetheless proved helpful to a Court's consideration of a settlement.  *See, e.g.*, Order, *Vergiev v. Aguero*, Docket No. L-2276-15 (N.J.

Sup. Ct.—Union Cty. Sept. 26, 2016) (attached as Einterz Decl. Ex. 10); *In re Riverbed, Inc. S'holders Litig.*, 2015 WL 7769861 (Del. Ch. Dec. 2, 2015).

## VIII.   CONCLUSION

For the reasons set forth above, Objector respectfully requests that the Court deny Plaintiffs' Motion, reject the settlement, refuse to certify the class, and deny Plaintiffs' Counsels' request for fees.

DATED:          October 13, 2016                    Respectfully submitted,

                                                     */s/ Michael L. Einterz*_____

OF COUNSEL:                                          Michael L. Einterz (11717-49)
                                                     Michael L. Einterz, Jr. (27824-49)
**MARGRAVE LAW LLC**                                 EINTERZ & EINTERZ
Anthony A. Rickey                                    4600 NW Plaza W. Drive
8 West Laurel Street, Suite 2                        Zionsville, IN 46077
Georgetown, Delaware  19947                          Telephone:  (317) 337-2021
Telephone:  (302) 604-5190                           Fax: (317) 337-2022
Fax:  (302) 258-0995                                 Email: mike@einterzlaw.com
Email: arickey@margravelaw.com                              michael@einterlzaw.com
                                                     *Counsel for Objector Sean J. Griffith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the Objection of Sean J. Griffith to Plaintiff's Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fee and Expenses, and Notice of Intention to Appear At Settlement Hearing has been e-mailed on the 13th day of October, 2016 to the counsel of record via the Court's ECF system.

I further certify that on the 13th day of October, 2016, a copy of the Objection of Sean J. Griffith to Plaintiff's Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fee and Expenses, and Notice of Intention to Appear At Settlement Hearing was mailed, by first class U.S. Mail, postage prepaid and properly addressed to the following:

      Anthony A. Rickey
      Margrave Law, LLC
      8 West Laurel Street, Suite 2
      Georgetown, Delaware 19947

                                /s/ Michael L. Einterz

EINTERZ & EINTERZ
4600 Northwest Plaza West Drive
Zionsville, Indiana 46077
(317) 337-2021
mike@einterzlaw.com

28