UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEPHEN BUSHANSKY Individually and on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> REMY INTERNATIONAL, INC., JOHN H. WEBER, JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, NORMAN STOUT, <br><br> Defendants. | Case No. 1:15-cv-01361-TWP-TAB |
| MAXINE PHILLIPS Individually and on behalf of herself and all others similarly situated, <br><br> v. <br><br> REMY INTERNATIONAL, INC., *et al.*, | Case No. 1:15-cv-01343-TWP-TAB |
| JASON GARCIA Individually and on behalf of himself and all others similarly situated, <br><br> v. <br><br> REMY INTERNATIONAL, INC., *et al.*, <br><br> Sean Griffith (Objector), <br><br> Interested Party. | Case No. 1:15-cv-01385-TWP-TAB |

**ENTRY ON PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION, AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

This matter is before the Court on a Motion for Final Approval of Class Action Settlement,

Class Certification, and Application for Award of Attorneys' Fees and Expenses filed by Plaintiffs

Stephen Bushansky ("Bushansky"), Maxine Phillips ("Phillips"), and Jason Garcia ("Garcia") (collectively "Plaintiffs"), (Filing No. 24).[1] The Plaintiffs, shareholders of Defendant Remy International, Inc. ("Remy"), each allege that Remy and Remy's Board of Directors ("Board")[2] (collectively "Defendants") caused a materially incomplete and misleading Form Schedule 14A Proxy Statement to be filed with the Securities Exchange Commissioner ("SEC") in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.A. §§ 78n(a), 78t(a), as well as 17 C.F.R. § 240.14a-9. Plaintiffs seek to represent a certain class of individuals who own public stock in Remy. On October 13, 2016, Sean Griffith ("Objector"), an interested party and shareholder of Remy, filed an objection in each of the three class actions. (Filing No. 27.) For the following reasons, Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses is **DENIED**.

## I. BACKGROUND

The following facts derive from the Plaintiffs' complaints, Plaintiffs' and Objector's briefs, and affidavits submitted in support of, and objection to, the request for final approval, as well as Plaintiffs' and Objector's findings of fact and conclusions of law.

### A. Factual Background

Remy, a Delaware corporation, is a major manufacturer, remanufacturer, and supplier of automobile components. BorgWarner Inc. (BorgWarner) is an American worldwide automotive industry components and parts supplier. On July 13, 2015, Remy announced that it entered an acquisition agreement with BorgWarner and Remy's shareholders would receive $29.50 in

---

[1] The individual Plaintiffs each filed a Complaint on behalf of themselves and all others similarly situated. The three related cases are nearly identical. For the sake of convenience, the Court addresses only the docket entries in Bushansky's action. Case No. 1:15-cv-01361.

[2] The members of Remy's Board of Directors are John H. Weber, John J. Pittas, Douglas K. Ammerman, Karl G. Glassman, Lawrence F. Hagenbuch, Charles G. McClure, Arik W. Ruchim, George P. Scanlon, and J. Norman Stout.

exchange for each share of Remy common stock.  ([Filing No. 40 at 2](Filing No. 40 at 2).)   On August 3, 2015, Remy filed a Preliminary Proxy Statement on Schedule 14A with the SEC (the "Preliminary Proxy").  *Id*.  On August 18, 2015, Remy filed a Definitive Proxy Statement on Schedule 14A with the SEC (the "Definitive Proxy").  *Id.*  Remy distributed the Definitive Proxy to its shareholders, which contained certain disclosures regarding Remy's acquisition, as well as summaries of Remy's financial projections from 2015 to 2019, among other things. The financial summaries included a discounted cash flow analysis[3] and an unlevered free cash flow calculation ("UFCF")[4] conducted by UBS Securities LLC ("UBS Securities"), Remy's financial advisor.

Shortly after Remy filed the Definitive Proxy with the SEC, Plaintiffs filed three putative, essentially identical, class action complaints. *Phillips v. Remy International Inc*., 1:15-cv-1343 (filed on August 25, 2015); *Bushansky v. Remy International Inc*., 1:15-cv-1361 (filed on August 27, 2015); *Garcia v. Remy International Inc*., 1:15-cv-1385 (filed on September 1, 2015).  The primary purpose of all three class actions was to elicit disclosure from Defendants regarding the merger and Definitive Proxy materials in order to better inform shareholders prior to their vote. On August 31, 2015, less than one week after Phillips and Bushansky filed their Complaints and one day prior to Garcia's Complaint, Plaintiffs sent a written settlement demand to Defendants. On September 11, 2015, within two weeks after Plaintiffs filed their Complaints, the parties entered into a Memorandum of Understanding ("MOU"), which set forth a settlement agreement

---

[3] "A method of evaluating a capital investment by comparing its projected income and costs with its current value. [DCF] is used to determine the value of a company by calculating the present value of its future cash flows. In theory, the value of the corporation's assets equals the present value of the expected cash flow generated by those assets." *Cash Flow*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[4] "A company's cash flow before interest payments are taken into account. Unlevered free cash flow can be reported in a company's financial statements, and shows how much cash is on hand to pay for operations before other financial obligations are taken into account." *Unlevered Free Cash Flow-UFCF*, INVESTOPEDIA, http://www.investopedia.com/terms/c/cashflowstatement.asp. (last visited August 14, 2017).

between Plaintiffs and Defendants. *Id.* As part of the MOU, Defendants agreed to file various supplemental disclosures with the SEC before September 22, 2015—the day Remy's shareholders met to approve the merger—in exchange for a release from liability for any other related claims on behalf of a proposed class of Remy's shareholders. *Id.* at 14.

On September 14-15, 2015, Defendants filed supplemental disclosures with the SEC. One week later, on September 22, 2015, 99.1% of Remy's shareholders voted in favor[5] of the merger. (Filing No. 20 at 9.) The merger closed, and Remy became a wholly owned subsidiary of BorgWarner on November 10, 2015. (Filing No. 40 at 13.) Thereafter, Defendants provided Plaintiffs with discovery to confirm the fairness and adequacy of the settlement agreement, including a non-public financial presentation by UBS Securities to the Board, as well as the Board's meeting minutes. *Id.* On June 24, 2016, Plaintiffs conducted a confirmatory deposition of Vijay Kumra, a UBS Securities representative and financial advisor to Remy. Plaintiffs concluded that the class settlement was fair and adequate.

**B.    Procedural Background**

On July 22, 2016, Plaintiffs sought preliminary approval of the disclosure settlement agreement, and on July 27, 2016, the Court granted Plaintiffs' request. (Filing No. 23.) In early October 2016, Plaintiffs requested final approval of the settlement, class certification, and an award of attorneys' fees and expenses in the amount of $409,844.50. (Filing No. 24.) On October 13, 2016, Objector asked the Court to deny Plaintiffs' request for final approval of the settlement, class certification, and Plaintiffs' attorneys' fees and expenses, asserting the supplemental disclosures were not plainly material, and they provided no benefit to Remy's stockholders, among other things. (Filing No. 27.) Thereafter, on November 2, 2016, the Court conducted a Settlement

---

[5] 25,578,692 shares were represented in person or by proxy: 25,349,958 shares for the merger, 10,997 shares against, and 217,737 shares abstaining.

Hearing regarding Plaintiffs' request for final approval of class action settlement, class certification, and award of attorney fees.

The Court found the following class to be proper:

> A non-opt-out class that includes: any and all record and beneficial holders of Remy common stock, their respective successors in interest, successors, predecessors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors and successors and assigns, who held Remy common stock at any time between and including July 13, 2015 and November 10, 2015, but excluding Defendants, their subsidiaries or other affiliates, their assigns, members of their immediate families, officers of Remy, and the legal representatives, heirs, successors, or assigns of any such excluded person.

([Filing No. 40 at 31](Filing No. 40 at 31)). In addition, the Court concluded Plaintiffs gave adequate notice.[6] Thereafter, Plaintiffs and Objector submitted proposed findings of fact and conclusions of law on the issues remaining before the Court—specifically whether the proposed settlement and Plaintiffs' attorneys' fees are adequate and fair.

Having considered the papers submitted, including but not limited to the oral argument of counsel, and all other evidence of record, the Court **DENIES** the motion for final approval. In light of this denial, the motion for fees and an incentive award are also **DENIED** as moot.

## II.  LEGAL STANDARD

Class action lawsuits are governed by Federal Rule of Civil Procedure 23. Rule 23(e) governs the process for judicial approval of any compromise of claims brought on a class wide basis. "In deciding whether to approve a class settlement [or compromise], a court must consider whether the agreement benefits class members." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 723–24 (7th Cir. 2016) (citing *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000)). Regarding disclosure only settlements, the Seventh Circuit adopted a

---

[6] Notice of the class was sent to 26,006 individuals. *Id*. at 17.

standard outlined in *Trulia*. *See id.* at 725; *see also In re Trulia, Inc. Stockholder Litig.,* 129 A.3d 884, 898-99 (Del. Ch. 2016). Under the *Trulia* standard: 1) supplemental disclosures must address a *plainly material misrepresentation or omission*; 2) the subject matter of the proposed release must be narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process; and 3) the record must show that such claims have been investigated sufficiently. *Id.*

### III. DISCUSSION

Plaintiffs move the Court to approve the proposed class settlement, as well as their attorneys' fees and expenses. Objector asks the Court to deny approval of the proposed settlement, asserting the supplemental disclosures are not plainly material, the release is overbroad, and the released claims have not been adequately investigated. Objector contends the supplemental disclosures provided no benefit to Remy's shareholders and objects to Plaintiffs' attorneys' fees.

**A.    Settlement Agreement**

Defendants do not admit or concede to liability or wrongdoing in the Stipulation and Agreement of Compromise, Settlement and Release. ([Filing No. 21-1 at 14](#).)  Nevertheless, Defendants agree to pay the Plaintiffs up to $400,000 in fees and up to $15,000 in expenses. *Id*. at 17, 38.  The Plaintiffs seek, and Defendants do not oppose, approval of $409,844.50 in attorneys' fees and expenses. ([Filing No. 25 at 37](#).)  In exchange, the Plaintiffs agree to release all claims and any potential future claims "of any kind, nature, or description whatsoever, whether direct, derivative, individual class,…, based on state and local, foreign, federal…, or any other law or rule, that any or all Plaintiffs or any or all members of the Class…, ever had, now have, or may have…, against any Released Parties that relate to … the Merger Agreement." ([Filing No. 35 at 10-11](#).)

Plaintiffs argue the Court should approve the proposed settlement agreement because they negotiated for supplemental disclosures, permitting shareholders to make a well-informed vote. Plaintiffs contend that the supplemental disclosures were material and included:

1) a non-public financial forecast that provides Remy's 2015-2019 projections for: (i) taxes, (ii) changes in net working capital, (iii) restructuring and impairment charges, (iv) a reconciliation of generally accepted accounting principles ("GAAP") net income and non-GAAP EBITDA (earnings before interest, taxes, depreciation and amortization), and (v) UFCF and adjustments thereto;

2) UBS Securities financial analyses of (1) UFCF figures utilized by UBS in its discounted cash flow analysis of Remy; (2) individual multiples for each of the selected public companies analyzed by UBS Securities, and (3) observed transaction-by-transaction (a) enterprise values, and (b) pricing multiples for each of the selected transactions analyzed by UBS Securities for its Selected Transactions Analysis for Remy; and

3) potential conflicts of interest involving Defendant Ruchim and UBS Securities.

([Filing No. 40 at 5-11](#)).

Objector relies on *In re Walgreen* when arguing the supplemental disclosures did little, if anything, to affect the shareholder vote, as evidenced by Remy's shareholder's approval of the acquisition by a majority of 99.1% of voting shares. *See In re Walgreen*, 832 F.3d at 723 ("[i]t is inconceivable that the six disclosures added by the settlement agreement either reduced support for the merger by frightening the shareholders or increased that support by giving the shareholders a sense that now they knew everything"). Disclosures are material if there is a substantial likelihood that they "affect the votes of a nontrivial fraction of the shareholders," implying that "a reasonable shareholder would consider [the disclosure] important in deciding how to vote." *Id.* at 723; *In re Trulia*, 129 A.3d at 899. The Court will first address the materiality of each disclosure.

7

1. **Reconciling GAAP and Non-GAAP**

Plaintiffs argue the supplemental disclosures are material because the disclosures reconciled GAAP and non-GAAP financial measures, namely EBITDA. Plaintiffs contend the Definitive Proxy created a confusing situation by advising shareholders that:

> Adjusted EBITDA as defined by the Company may differ from EBITDA or adjusted EBITDA used by other companies and is not a measurement under U.S. GAAP. There are limitations inherent in non-U.S. GAAP financial measures in that they exclude a variety of charges and credits that are required to be included in a U.S. GAAP presentation, and therefore do not present the full measure of the Company's recorded costs against its revenue. Adjusted EBITDA should not be considered in isolation or as a substitute for net income, operating income, cash flows from operating activities or any other measure of financial performance presented in accordance with GAAP or as a measure of a company's profitability or liquidity.

([Filing No. 28-2 at 56](Filing No. 28-2 at 56) n.3).

Plaintiffs assert that Remy's warning is useless because, although the warning notes the inherent limitation in non-GAAP financial measures and that adjusted EBITDA should not be considered in isolation or as a substitute for net income, the Definitive Proxy failed to reference any net income. Plaintiffs also contend that reconciliation is important because Regulation G prohibits the use of non-GAAP financial measures, unless they are accompanied by a comparable GAAP accounting measure. *See* 15 U.S.C. § 7261 ("financial information included… in any periodic or other report filed with the [SEC] pursuant to the security laws, or any public disclosure…, shall be presented in a manner that [] 1) does not contain an untrue statement of a material fact or omit to state a material fact…; and 2) reconciles it with the financial…result…under generally accepted accounting principles"). Plaintiffs argue the supplemental disclosures remedied this issue, and reconciled the use of EBITDA, by providing Remy's net income.

In response, Objector contends the Definitive Proxy's notice regarding "adjusted EBITDA" does not imply that Defendants were required to disclose GAAP-reconciled figures. Objector argues that Plaintiffs failed to point to any case law establishing that reconciliation is material. Objector also notes that Plaintiffs failed to present evidence that the SEC requires proxy statements to include a reconciliation between non-GAAP and GAAP financial measures.

The Court agrees with Objector. Plaintiffs failed to establish whether reconciliation between GAAP and non-GAAP financial measures is required in proxy statements and material for shareholders. Plaintiffs point to § 7261 for the proposition that reconciliation is required; however, the Court notes the Definitive Proxy establishes that Remy's "financial forecasts were not prepared with a view toward public disclosure [or] the published guidelines of the SEC regarding projections and the use on non-GAAP measures..." ([Filing No. 28-2 at 55](Filing No. 28-2 at 55)). If the Definitive Proxy's statement is taken at face value, § 7261 is inapplicable because the Definitive Proxy is not a periodic report or a public disclosure. Without more binding information that financial forecasts in proxy statements require reconciliation between GAAP and non-GAAP financial measures, the Court finds that such information is not plainly material.[7]

### 2. <u>Unlevered Free Cash Flow and Discounted Cash Flow</u>

Plaintiffs rely on numerous cases when asserting the additional details regarding whether UBS Securities' cash flow calculations are material. *See Chen v. Howard-Anderson*, 87 A.3d 648, 689 (Del. Ch. 2014) (noting "[i]n the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate"); *In re*

---

[7] Plaintiffs also point to speeches given by SEC staff for the proposition that reconciliation is required. *See* Mary Jo White, Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016); Mary Jo White, Keynote Address at the 2015 AICPA National Conference: "Maintaining High-Quality, Reliable Financial Reporting: A Shared and Weighty Responsibility" (Dec. 9, 2015). The Court, however, finds that these speeches are not binding, and they fail to address whether financial forecasts in proxy statements require reconciliation between GAAP and Non-GAAP financial measures.

*Emerging Commc'ns, Inc. Shareholders Litig.*, No. CIV.A. 16415, 2004 WL 1305745, at *37 (Del. Ch. May 3, 2004) (holding the failure to disclose the existence of June projections to minority shareholders, among other things, amounted to a misdisclosure and was highly material because knowledge of the June projections would have enabled the shareholders to understand [the Company's] intrinsic worth and the extent of the market's undervaluation of their company); *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) (enjoining a merger where a proxy statement selectively disclosed cash flow estimates provided by the company to the financial advisor, but noting a difference of opinion regarding the materiality of such information amongst Delaware courts); *In re Netsmart Techs., Inc. Shareholders Litig.*, 924 A.2d 171, 177 (Del. Ch. 2007) (holding a Proxy was materially incomplete because it failed to disclose projections a financial advisor used to perform the discounted cash flow valuation supporting its fairness opinion); Transcript of Record at 38, *In re BTU Int'l, Inc. Stockholders Litigation*, No. 10310-CB (Del. Ch. Feb. 18, 2016) (finding material the nondisclosure of any form of management's projections concerning revenues, EBITDA, UFCF, or any other form of metric).

In this case, UBS Securities disclosed that the formula it used to calculate Remy's UFCF consisted of EBITDA, less unlevered taxes, less total capital expenditures, less working capital and less restructuring charges. Plaintiffs argue the Definitive Proxy contained only estimates of revenue, EBITDA, depreciation and amortization, as well as capital expenditures, but excluded information regarding unlevered taxes, working capital and restructure charges. Plaintiffs contend the supplemental disclosures remedied this problem by disclosing Remy's projected UFCF, as well as the omitted detailed information underlying the calculation. Plaintiffs assert the additional details allowed shareholders to: 1) independently prepare a discounted cash flow analysis, and 2) critically review the discounted cash flow analysis performed by UBS Securities in order to assess

10

its accuracy, reasonableness, and the amount of weight to place on UBS Securities' discounted cash flow results.

In response, Objector argues that the Definitive Proxy contained over four pages of detailed information regarding Remy's financial forecast, including summaries of estimated revenue, adjusted EBITDA, depreciation and amortization expenses, capital expenditures, and a description of assumptions underlying these financial forecasts relating to potential sales growth and exchange rates. Objector asserts the information outlined in the Definitive Proxy was sufficient because, under well-established law, stockholders are entitled to receive only a fair summary of the substantive work performed by a financial advisor. *See In re Trulia*, 129 A.3d at 900 ("when the board relies on the advice of a financial advisor…stockholders are entitled to receive in the proxy statement a fair summary of the substantive work performed by the investment bankers [] whose advice…as to how to vote on a merger or tender rely") (internal quotation marks omitted). "A fair summary [] is a *summary*, [and] it need not contain all information underlying the financial advisor's opinion or contained in its report to the board." *Id*. The essence of a fair summary is an accurate description of the advisor's methodology and key assumptions, rather than an abundance of financial data. *Id*. at 901. Objector also contends Plaintiffs incorrectly assert that the additional disclosure is material because it allows stockholders to recreate a discounted cash flow analysis. *See In re Trulia*, 129 A.3d at 901 ("[a] fair summary does not require disclosure of sufficient data to allow stockholders to perform their own valuation.").

The Court finds, based on the facts of this case, the disclosure of certain figures underlying UBS Securities' cash flow calculations is immaterial. After reviewing the supplemental disclosure, as compared to the Definitive Proxy, the Court concludes that the additional "disclosures provide extraneous details [that] do not contribute to a fair summary and do not add value for

11

stockholders." *See In re Trulia*, 129 A.3d at 900–01. "[I]nformation is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it 'significantly alter[s] the 'total mix' of information made available.'" *Id.* at 899 (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

The Definitive Proxy already disclosed UBS Securities' formula for calculating Remy's UFCF, as well as summaries and descriptions of certain financial projections underlying the cash flow calculations. From these calculations, UBS Securities found that Remy's discounted cash flow analysis amounts to approximately $23.56 to $30.86 per share of Remy's common stock. The Court notes, and Plaintiffs do not deny, the discounted cash flow and cash flow figures disclosed in the Definitive Proxy are unaltered by the supplemental disclosures. The Court also finds Plaintiffs' argument—the supplemental disclosures were material because they enabled shareholders to independently prepare a discounted cash flow analysis—is without merit because "[a] fair summary does not require disclosure of sufficient data to allow stockholders to perform their own valuation". *See In re Trulia*, 129 A.3d at 901. Accordingly, it is not likely that the disclosure of additional line item figures underlying UBS Securities' unaltered cash flow calculation addresses a plainly material misrepresentation or omission that would likely matter to a reasonable shareholder. *See In re Walgreen*, 832 F.3d at 724-25 (quoting *In re Trulia*, 129 A.3d at 898-99).

Additionally, the Court finds that Plaintiffs' reliance on *Chen*, *In re Emerging Commc'ns*, *In re Netsmart Technologies* and *In re BTU* is misplaced because in those cases the companies omitted substantial projections, such as their most recent financial forecasts or financial projections for an entire year. *See Chen*, 87 A.3d at 689 (denying summary judgment because the court could not determine as a matter of law whether excluded revenue projections for 2012 were immaterial);

*In re Emerging Commc'ns*, 2004 WL 1305745, at *37 (holding misdisclosure of June projections were highly material because knowledge of the June projections would have enabled the shareholders to understand [the Company's] intrinsic worth and the extent of the market's undervaluation of their company); *In re Netsmart Techs.*, 924 A.2d at 177 (holding a Proxy was materially incomplete because it failed to disclose any projections used to perform the discounted cash flow valuation); Transcript of Record at 38, *In re BTU Int'l, Inc. Stockholders Litigation*, No. 10310-CB (Del. Ch. Feb. 18, 2016) (holding there is no *per se* rule about management forecasts but finding material the nondisclosure of free cash flow projections where the proxy failed to disclose *any* form of management's projections concerning revenues, EBITDA, UFCF, or any other form of metric).

In this case, Remy merely omitted projected unlevered taxes, working capital and restructure charges that were utilized in UBS Securities' unaltered cash flow calculations. Further, because the Seventh Circuit endorses the standard in *Trulia*, Plaintiffs' reliance on *In re Netsmart* is also misplaced because *Trulia* explains that the Definitive Proxy does not need to disclose all projections relied on by UBS Securities. *See Maric Capital Master Fund*, 11 A.3d at 1178 (enjoining a merger where a proxy statement selectively disclosed cash flow estimates); *but see In re Trulia*, 129 A.3d at 900-01 ("[a] fair summary, however, is a *summary*. By definition, it need not contain all information underlying the financial advisor's opinion or contained in its report to the board").

### 3. Market-Based Approach to Valuation

Plaintiffs also contend the supplemental disclosures were material because they provided specific figures analyzed by UBS Securities when comparing Remy to other public companies. UBS Securities analyzed nineteen publicly traded companies and six precedent merger

13

transactions in order to compare Remy to each of its peers with respect to pricing multiples and size, among other things. The Definitive Proxy provided the mean and median figures for the peer samples. The supplemental disclosures provided transaction details and individual multiples for each of the companies, which totaled the mean and median figures provided by UBS Securities. Plaintiffs assert the additional information is material because it gave greater context regarding how Remy compared to its peers, a complete picture of the work done by UBS Securities, as well as enabled shareholders to calculate Remy's share values.

Objector argues that the supplemental disclosures merely provided individual multiples and, as such, are immaterial. *See Trulia*, 129 A.3d at 904-906 (holding additional information regarding individual multiples was immaterial and amounted to "trivialities [that] was not helpful to [the] stockholders"). Objector contends that the addition of individual multiples did not correct an error or alter UBS Securities' ultimate conclusions.

The Court finds, as it relates to the facts of this case, the disclosure of individual multiples for each of the nineteen companies UBS Securities compared to Remy, as well as figures underlying six merger transactions examined by UBS Securities, is immaterial. Regarding the individual multiples, the Definitive Proxy lists the names of the nineteen companies, the median and mean figures for the peer samples, and also notes that UBS Securities reviewed "the enterprise values…of the selected companies as a multiple of actual EBITDA for the last twelve-months…and calendar years 2015 and 2016 estimated EBITDA," as well as "the price-earnings ratio of the selected companies based on estimated calendar year 2015 and 2016 earnings." ([Filing No. 28-2 at 52](#).). The supplemental disclosure outlines the enterprise values and price-earnings ratio figures for each selected company during calendar years 2015 and 2016; however, the Definitive Proxy makes clear that those figures are publicly available via I/B/E/S, a database

14

operated by Thomas Reuters. *Id*. Furthermore, the Court notes that the additional figures do not alter the mean and median figures provided in the Definitive Proxy. Regarding the six merger transactions, the Definitive Proxy lists the announcement dates, acquirers, and targets. It also notes that UBS Securities reviewed the enterprise value, "transaction values in the selected transactions as a multiple of the last twelve-month sales, and EBITDA," among other things. *Id*. at 53. The supplemental disclosure outlines the enterprise values, as well as the sales and EBITDA figures, however, the Definitive Proxy again makes clear that those figures are publicly available.

Accordingly, because the individual multiples are publicly available and do not alter the mean and median figures provided by UBS Securities, the Court finds the additional information immaterial because it fails to alter the total mix of available information. *See In re Trulia,* 129 A.3d at 905 (holding individual company multiples were immaterial where the information was publicly available and the proxy already included median multiples for three different categories of comparable companies, among other reasons).

### 4. **Potential Conflicts**

Plaintiffs lastly argue the supplemental disclosures were material because they disclosed potential conflicts, specifically that Ruchim is a partner at H Partners Management, LLC—Remy's second largest stockholder—and additional background information regarding UBS Securities. Plaintiffs argue that this information is material because it allowed shareholders to assess whether a conflict of interest existed. In response, Objector argues the supplemental disclosures were redundant and immaterial because the Definitive Proxy already disclosed the potential conflicts of interest regarding Ruchim and UBS Securities.

The Court agrees with Objector and finds that the Definitive Proxy disclosed that Ruchim is an employee with Remy's second largest shareholder. *See* ([Filing No. 28-2 at 37](), 99).

Additionally, the Definitive Proxy, as it relates to UBS Securities, reads as follows with the information added by the supplemental disclosures appearing in bold:

> Under the terms of UBS' engagement, the Company agreed to pay UBS for its financial advisory services in connection with the merger an aggregate fee currently estimated to be approximately $8.6 million, a portion of which has been paid in connection with UBS' opinion and approximately $7.6 million of which is contingent upon consummation of the merger. In addition, the Company agreed to reimburse UBS for its reasonable expenses, including fees, disbursements and other charges of counsel, and to indemnify UBS and related parties against liabilities, including liabilities under federal securities laws, relating to, or arising out of, its engagement. In the past, UBS and its affiliates have provided investment banking and financial advisory services to the Company unrelated to the merger, for which UBS and its affiliates received compensation, including having acted as financial advisor to the Company in its 2014 transaction with Fidelity National Financial, Inc. and Joint Lead Arranger and Bookrunner in the refinancing of the Company's debt facility in 2013, **for which UBS received aggregate fees of approximately $1.0 million and $0.45 million, respectively**. In the ordinary course of business, UBS and its affiliates may hold or trade, for their own accounts and the accounts of their customers, securities of the Company and Parent and, accordingly, may at any time hold a long or short position in such securities**. UBS has neither performed services for nor collected any fees from Parent since January 1, 2013**.

*Id*. at 54 (emphasis added).

Plaintiffs argue that the additional information regarding the historical aggregate fees that UBS Securities received as an arranger and bookrunner is material because the shareholders could assess whether UBS Securities was incentivized to support the acquisition based on the historical fees as compared to the fees UBS Securities stood to receive upon consummation of the merger. The Court finds that the inclusion of the historical aggregate fees are immaterial. The Definitive Proxy already permits shareholders the ability to assess whether UBS Securities was incentivized to support the acquisition because the relevant portion of the Definitive Proxy establishes that UBS Securities received $1 million and stood to lose $7.6 million if the merger did not consummate. Additionally, Plaintiffs have not presented any evidence or case law establishing that the inclusion of historical fees in similar situations is material. Accordingly, the addition of the potential

16

conflicts was not plainly material and did not significantly alter the total mix of information. *See In re Trulia*, 129 A.3d at 899.

In response to the question of whether the supplemental disclosures "*would* be *likely* to matter to a reasonable investor" (or in this case a shareholder), the Court's answer would be "no". *See In re Walgreen*, 832 F.3d at 724. Because the Court finds that none of the supplemental disclosures are material, the Court need not address whether the proposed release is narrowly circumscribed or whether Plaintiffs sufficiently investigated their claims.

**B.** **Plaintiffs' Attorneys' Fees and Expenses**

The parties agreed to an award of $409,844.50 for attorneys' fees and expenses. Plaintiffs argue that it is reasonable and should be approved because Plaintiffs' counsel devoted in excess of 531.9 hours and incurred $9,844.50 in unreimbursed expenses. Plaintiffs also contend the proposed fees and expenses of $409,844.50 reflects less than a 1.12 multiplier to Plaintiffs' counsel's lodestar of $354,884.50. Plaintiffs additionally argue that the attorneys' fees are appropriate because the attorneys conferred a substantial benefit to the class when obtaining the supplemental disclosures.

In response, Objector argues the Court should deny Plaintiffs' attorneys' fee request because $409,844.50 amounts to unreasonably "sweet fees for class counsel, who devoted less than a month to the litigation…that produced no value." *See In re Walgreen*, 832 F.3d at 725. Objector also takes issue with Plaintiffs using five law firms and purportedly spending 531.9 hours prosecuting litigation, which Plaintiffs sought to settle less than one week after Phillips and Bushansky filed their Complaint and one day prior to Garcia filing a Complaint.

Even if the Court finds that the fees and expenses are fair as a standalone matter, the Court declines to approve Plaintiffs' attorneys' fees request because the class action settlement did not

17

benefit the shareholders. "No class action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand." *Id.* at 724. "A class representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain [no benefit] ... is not adequately protecting the class members' interests." *Id*. at 725 (quoting *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748, 752 (7th Cir. 2011)). Accordingly, Plaintiffs' request for fees and expenses is **denied**.

C. **Objector's Counsel Fees and Expenses**

Objector also asks the Court to grant his attorney's fees but has not suggested an appropriate amount. Objector relies on *In re Riverbed Tech.*, when contending his attorney's fees are appropriate because Objector benefitted the class by preserving their rights and successfully defeating Plaintiffs' Motion. *See In re Riverbed Tech., Inc. Stockholders Litig.*, No. CV 10484-VCG, 2015 WL 7769861, at *2–3 (Del. Ch. Dec. 2, 2015) (awarding an objector $10,837.00 in attorney's fees and costs where the objector produced a modest benefit to the class by reviewing the record closely, reviewing proposed settlement and case law, and drafting briefing in opposition of the settlement). Accordingly, Objector is granted **thirty (30) days** from the date of this Entry to file his motion for fees, thereafter, the parties will have **thirty (30) days** to file a response.

IV. **CONCLUSION**

The Court recognizes the costs stemming from a denial of final approval and does not question the integrity of class counsel or counsel for Defendants. Indeed, all have proven able and have no doubt litigated in earnest. Nonetheless, it should not be a close call that the supplemental information is material as that term is defined. *See In re Trulia*, 129 A.3d at 898. The Court of Chancery's decision in *Trulia* and the Seventh Circuit's decision in *Walgreen* provide that

18

disclosure-only settlements should be entered into only in circumstances involving plainly material supplemental disclosures. Here, it is evident that the supplemental disclosures fail to address a plainly material misrepresentation or omission and do not benefit the proposed class.

For the reasons stated above, the Court **SUSTAINS** the Objector's objection ([Filing No. 27](#)) and **DENIES** the Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses ([Filing No. 24](#)) in Case No. 1:15-cv-01361-TWP-TAB. The Court **SUSTAINS** the Objector's objection (Filing No. 24) and **DENIES** the Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses (Filing No. 20) in Case No. 1:15-cv-01343-TWP-TAB. The Court **SUSTAINS** the Objector's objection (Filing No. 31) and **DENIES** the Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses (Filing No. 26) in Case No. 1:15-cv-01385-TWP-TAB. The Clerk is **directed** to docket this Order in Cases 1:15-cv-01361-TWP-TAB, 1:15-cv-01343-TWP-TAB, and 1:15-cv-1385-TWP-TAB.

The Parties shall confer to determine case management deadlines and should contact the Magistrate Judge to schedule a status conference regarding how the parties intend to proceed.

**SO ORDERED.**

Date: 8/16/2017

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Marc L. Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, Pennsylvania 19004

Anne N. DePrez
BARNES & THORNBURG LLP (Indianapolis)
adeprez@btlaw.com

Michael L. Einterz, Jr.
EINTERZ & EINTERZ
michael@einterzlaw.com

Michael L. Einterz, Sr.
EINTERZ & EINTERZ
mike@einterzlaw.com

Charles R. Whybrew
LEWIS WAGNER LLP
cwhybrew@lewiswagner.com

A. Richard Blaiklock
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Anthony A. Rickey
MARGRAVE LAW LLC
arickey@margravelaw.com